UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JWAUN L. POINDEXTER, Plaintiff, | ) | |
| v. | ) | No. 1:23-cv-01217-JRO-CSW |
| ARNOLD, et al., Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Jwaun Poindexter, an inmate at the Indiana Department of Correction ("IDOC") filed this action alleging constitutional violations related to an assault while he was housed at Pendleton Correctional Facility ("Pendleton"). The Court allowed Poindexter to proceed on claims against IDOC Defendants Arnold, Stamper, Knotts, Pfleeger, Gray, Richardson, and Koening, (the "IDOC Defendants") related to their failure to properly transfer him to safe housing, their failure to act before and during an attack from another inmate on April 23, 2023, and their failure to protect him during that assault.[1]

The IDOC Defendants have moved for summary judgment, dkt. 86, arguing that his Constitutional rights were not violated as a result of any action or inaction of Arnold, Stamper, Knotts, Pfleeger and Koening, and that Gray and Richardson reacted reasonably to the April 30, 2023. Dkt. 88. For the reasons

[1] Mr. Poindexter also raised claims related to his medical care after his assaults, but the Court previously granted summary judgment as to claims against the medical defendants due to Poindexter's failure to exhaust his administrative remedies. Dkt. 62.

below, the IDOC Defendants' Motion for Summary Judgment, dkt. [86], is **GRANTED**.

## I. SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A).

Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II. FACTUAL BACKGROUND

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Poindexter and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572.

### A. The Parties

At all times relevant to his Complaint, Poindexter was an inmate in the custody of the IDOC and housed at Pendleton. Dkt. 87-1 at 6. Defendant Stamper was a Unit Team Manager ("UTM") at Pendleton. Dkt. 87-2 at 1–2. Defendant Arnold was a UTM at Pendleton and reported to Stamper. *Id.* Defendant Knotts was a Case Manager at Pendleton and also reported to Stamper. *Id.* Defendant Pfleeger was a correctional officer and lieutenant at Pendleton. Dkt. 87-3 at 1–2. Defendant Koenig was a correctional officer at Pendleton. *Id.* Defendant Gray was a Correctional sergeant at Pendleton. Dkt. 87-4 at 1–2. Defendant Richardson was a correctional officer at Pendleton. *Id.*

### B. The First Assault: January 31, 2023[2]

On January 31, 2023, while in H Cellhouse, Poindexter was asked by another inmate at Pendleton to traffic items into the prison because of Poindexter's history of trafficking items and connection to a family member of

[2] Poindexter does not raise claims related to this assault, but the details about this assault provide important context for his claims related to the April assault.

the other inmate. Dkt. 87-1 at 7–11. Poindexter refused to participate, which led to an altercation with the inmate. *Id.* After the fight, Poindexter informally conversed with a non-party Pendleton employee and submitted a formal written request to be removed from H Cellhouse based on the known gang affiliations of several inmates, including the one who assaulted him. *Id.* at 12–14.

On February 21, Poindexter was moved to J Cellhouse. *Id.* at 16. Once Poindexter was moved to J Cellhouse, he still had concerns regarding the inmates in his previous cellhouse, H Cellhouse, because of their gang affiliations and overall potential for gang retaliation. *Id.* at 16–17. At some point, Poindexter requested to speak with Case Manager Knotts to again express his concerns about gang affiliations in H Cellhouse that could result in him being assaulted, but the discussion did not occur because he had already been moved to J Cellhouse and away from his previous assaulter. *Id.*

Six days later, Poindexter barricaded himself in his cell and, after several communications between Poindexter's girlfriend and Pendleton staff, he was removed by Officers Pfleeger and Koenig when no other inmates were in the general area. Dkt. 87-1 at 19–20, dkt. 87-5 at 9. Poindexter was eventually taken to UTM Stamper's office where he met with Stamper and UTM Arnold to discuss concerns he had regarding his safety in H Cellhouse. Dkt. 87-1 at 20. Poindexter testified at his deposition that he asked to be separated from Walker, the inmate attacker on January 31, and the 'shot caller' over the gang organization the attacker was a part of, who were both located on Poindexter's cellblock at the

time. *Id.* at 13–14. He also rearticulated his larger safety concerns, stating "I just assaulted one of their brothers, either I'm going to do what they asked of me or there's going to be further things happen." *Id.* at 20–21.

At the meeting with UTMs Stamper and Arnold, Poindexter demanded immediate removal from his current cell. *Id.* at 22. UTMs Stamper and Arnold said they could not do anything until Poindexter filled out a request for protective custody status and the paperwork was processed. So Poindexter told them that he was suicidal. *Id.* Based on his indication of suicidal ideation, Officers Pfleeger and Koenig placed Poindexter into protective anti-harm gear and moved him into a shower near Stamper's office. Dkt. 87-2 at 2–3.

After Poindexter was in the shower for several hours, a mental health provider evaluated him and determined he should be placed on suicide watch. Dkt. 87-1 at 27. He was then placed in a holding cell in a separate area of the facility for a few days. *Id.* at 29. After leaving suicide watch, Poindexter was returned to his cell in J Cellhouse for about a week, where he continued to be threatened by other gang-affiliated inmates but not by the individuals about whom he had previously notified UTM Stamper. *Id.* at 30–31.

A request for protective custody status must go through an evaluation by custodial and non-custodial staff to determine the inmate's reasoning for the request, the potential harm that could befall that inmate, the availability of other locations for them to be housed, and a variety of other considerations that often require several days to evaluate properly. Dkt. 87-2 at 2–3. Several weeks after

Poindexter submitted his request for protective custody, he received notice that it was denied because there was no way to corroborate the threats. Dkt. 87-1 at 34; *see also* dkt. 87-5 at 10 (Feb. 27, 2023, email from Defendant Arnold stating, "We had him fill it PC paper work and it is being denied due to little or no verifiable information.").

On March 10, Poindexter was transferred to E Cellhouse. *Id.* at 32–33. Poindexter had wanted to be placed in E Cellhouse anyway because it had a therapeutic drug program that could provide him the opportunity to have his sentence modified. *Id.* He had been waiting to get into the program for about a year. *Id.* at 34. He still had the same general safety concerns he had in his previous two cellhouses, but he did not express any of these concerns to any of the Defendants. *Id.* at 34–35.

**C. The Second Assault: April 30, 2023**

On April 30, Poindexter was involved in a violent altercation with another inmate in E Cellhouse. Dkt. 87-5 at 1–8. In the common area, Poindexter confronted another inmate because of the inmate's gang affiliation, and a fight broke out involving numerous other inmates armed with makeshift weapons. Dkt. 87-1 at 36–38. There is video of this fight. Dkt. 87-6 at 4:18–5:44. The video shows Poindexter, who was also armed, being knocked prone and stabbed several times by the inmate whom he confronted at the start of the fight. *Id.*

Officer Richardson, who was working in the nearby control area, witnessed the fight first. Dkt. 87-5 at 1. Officer Richardson called a "10-10," which indicates

an emergency situation involving inmate violence, and Officer Gray was the officer in charge who responded to that 10-10 call. *Id.;* Dkt. 87-4 at 1–2. Based on the dozen inmates in the common area and the numerous weapons in use, Officer Gray did not immediately intervene. *Id.* at 2. Instead, he requested a weapons team, which is equipped with tasers and various forms of crowd control options, to respond to the scene first. *Id.* Officer Gray decided to wait for a weapons team because the fight involved several inmates with several weapons, he did not know the cause of the altercation, and therefore he did not know if guards would be targeted. *Id.* at 2–3.[3]

Once the weapons team arrived approximately a minute later, the team subdued the inmates, and Poindexter and other inmates involved in the altercation were transported to the infirmary for further medical attention. Dkt. 87-5 at 1, 4; Dkt. 87-4 at 2–3. Immediately after the incident, Poindexter was interviewed by a member of the Pendleton Investigatory Team where he admitted that he "didn't know what to do, so he 'handled it' himself" and that he "went after" the inmate who he believed was intimidating him. Dkt. 87-5 at 6. IDOC reviewed evidence about the altercation and, based on Poindexter's admissions, referred him to the local prosecutor's office for potential criminal charges via a probable cause affidavit. *Id.* at 3–8.

---

[3] In his response, Poindexter seems to contest this retelling of the April 30 fight and instead alleges that Officer Gray and Richardson's delay was "purposeful" because they believed he "needed to learn a lesson." Dkt. 97 at 23-24. However, to support this contention, Poindexter cites, among other documents, the probable cause affidavit for his criminal matter, which actually supports Officer Gray's retelling of events. Dkt. 89 at 119–124.

On July 2, 2024, Poindexter pled guilty in state court to the crimes of a prisoner possessing a deadly weapon and battery by means of a deadly weapon. Dkt. 87-7 at 1–7.

**III. DISCUSSION**

Prison officials have a duty to protect inmates from violent assaults by other inmates. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). They incur liability for the breach of that duty when they were "aware of a substantial risk of serious injury to [an inmate] but nevertheless fail[] to take appropriate steps to protect him from a known danger." *Guzman v. Sheahan*, 495 F.3d 852, 857 (7th Cir. 2007) (quoting *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002)); *see also Santiago v. Walls*, 599 F.3d 749, 758–59 (7th Cir. 2010). To succeed on a claim for failure to protect, Poindexter must show that (1) Defendants were aware of a substantial risk of serious injury to him, and (2) they acted with deliberate indifference to that risk. *See Farmer*, 511 U.S. at 834, 837; *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008). An official will only be liable when he disregards that risk by failing to take reasonable measures to abate it. *Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006). Further, damages are unavailable merely for fear of an unrealized attack. *Babcock v. White*, 102 F.3d 267, 270 (7th Cir. 1996).

A defendant has actual knowledge of impending harm if the plaintiff complained to him about "a specific threat to his safety." *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (internal quotation marks omitted). However, "[c]omplaints that convey only a generalized, vague, or stale concern about one's

safety typically will not support an inference that a prison official had actual knowledge that the prisoner was in danger." *Id.* at 480–81. By contrast, "a complaint that identifies a specific, credible, and imminent risk of serious harm and identifies the prospective assailant typically will support an inference that the official to whom the complaint was communicated had actual knowledge of the risk." *Id.* at 481 (officers had notice that plaintiff was in danger of being attacked where plaintiff told them about an individual who repeatedly threatened to stab him and had remarked that he had snitched on a prior cellmate). A defendant cannot be held liable merely for knowing general risks of violence in prisons. *Brown v. Budz*, 398 F.3d 904, 913 (7th Cir. 2005) (citing *Weiss v. Cooley*, 230 F.3d 1027, 1032 (7th Cir. 2000)).

### A. Claims Against Arnold, Stamper, Knotts, Pfleeger, and Koening

Poindexter alleges that these defendants are liable because UTMs Arnold and Stamper "did nothing to stop the progression of attacks … from other inmates" in response to his requests for protective custody. Dkt. 87-1 at 55. Further, he states that Officers Pfleeger and Koenig are liable because, when they took him to Stamper's office and placed him in anti-harm gear, he was "put into the shower for no reason." *Id.* at 58. Poindexter finally brings claims against Knotts on the grounds that "she was forwarded … a request" for protective custody and denied it. *Id.* at 56.

Poindexter has not satisfied the first element of his failure to protect claim against any of these defendants because he has not shown that they were aware of a substantial risk of serious harm.

After the January 31 altercation, Poindexter was transferred from H Cellhouse to J Cellhouse. Thus, when he met with UTMs Arnold and Stamper, any immediate threat from his attackers in the H Cellhouse had already been resolved. Still, based on Poindexter's concerns about other gang members, UTMs Arnold and Stamper had Poindexter complete a form to be considered for protective custody. No reasonable jury could find that Arnold or Stamper's response was unreasonable. They cannot be held liable for general fears of inmate violence, and the only known threats—Inmate Walker and the other gang member from the January incident—were no longer a threat at this time. *Gevas*, 798 F.3d at 480–81.

Similarly, Officers Pfleeger and Koenig reasonably responded to any risk of harm to Poindexter's safety when he expressed suicidal ideation by placing him in protective clothing and putting him in a separate area so that he could be evaluated by a mental health professional. To the extent that Poindexter disagrees with their decision to place him in a shower while they waited for a mental health evaluation, it is undisputed that he was not attacked or otherwise injured during this placement. They cannot be liable for an unrealized attack. *Babcock*, 102 F.3d at 270. And his response does not provide any evidence that would present a dispute of material fact.

Likewise, Poindexter has failed to show that Caseworker Knotts was aware of a substantial risk of serious harm to him. His allegations are simply that he requested to speak to Knotts before he was transferred away from his January 31 attackers, but that the meeting was cancelled after he was moved to J Cellhouse. Dkt. 87-1 at 16. As Defendants correctly observe, the meeting was cancelled because Poindexter's safety concerns regarding the previous altercation were addressed with his transfer to a different cellblock away from the attackers.

Finally, the defendants cannot be held liable for the decision to deny his formal request for protective custody because the denial was because Poindexter provided "little to no verifiable information" showing he needed that protection. Dkt. 87-5 at 10. Poindexter's vague concerns about gang violence did not put these defendants on notice that he was at risk of a serious attack. *See e.g., Klebanowski v. Sheahan,* 540 F.3d 633, 639 (7th Cir. 2008) (finding that the plaintiff's statements that he was afraid for his life and wanted to be transferred were insufficient to alert officers to a specific threat); *Dale*, 548 F.3d at 569 (plaintiff's statements that inmates were "pressuring him" and "asking questions" did not adequately notify the officers of a serious threat to plaintiff's safety). This is especially so given the fact that the attack occurred at E Cellhouse—a cellblock to which Poindexter had specifically wanted to move for a year because of its drug programming. Thus, Defendants Arnold, Stamper, Knotts, Pfleeger, and Koening are entitled to summary judgment.

## B. Claims Against Officers Gray and Richardson

Poindexter testified in his deposition that he brings claims against the two officers because of their delay in protecting him from other inmates during the April 30 attack. Specifically, he testified

> "[t]his is a delayed response . . . Gray . . . called for the weapons team arrival, meaning he arrived at the scene. He's a response OIC [meaning] Officer in Charge. After seeing two offenders stabbing another on the ground and refusing orders – meaning that he was giving them orders for them to stop, but they did not stop. He had another officer there, which he is equipped with a taser . . . Richardson even said he gave orders for them to stop. That's a delayed response. If you don't act, you delay. If you don't respond, that means that you're not reacting.

Dkt. 87-1 at 42–43.

Although Poindexter was seriously injured during this fight, an officer's failure to immediately intervene in an armed inmate attack for their own safety does not rise to the level of deliberate indifference. Here, the undisputed record reflects that Poindexter's second altercation was a large fight between numerous armed inmates with makeshift weapons. Officer Richardson immediately issued an emergency signal to call more officers to the scene upon realizing the severity of the issue. Dkt. 87-5 at 1, 4. Then based on the number of armed inmates and lack of response personnel, Officer Gray decided to call for a weapons team rather than have fewer protected officers respond. Dkt. 87-4 at 2–3.

Prison officials who have actual awareness of a substantial risk to the health or safety of an inmate incur no liability if they "responded reasonably to

the risk, even if the harm ultimately was not averted, because in that case it cannot be said that they were deliberately indifferent." *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002). Further, the "mere failure of the prison official to choose the best course of action does not amount to a constitutional violation." *Id.* (cited by *Guzman v. Sheahan*, 495 F.3d 852, 857 (7th Cir. 2007)).

Officers Gray and Richardson's response was reasonable. As Plaintiff's own testimony confirms, they did not ignore the fight but issued verbal commands to stop while calling for a weapons team before physically intervening. Had they not waited for the weapons team, they could have been subjected to serious injury from the makeshift weapons wielded by multiple inmates. Guards are not required to take unreasonable risks by attempting to break up a fight between inmates when the circumstances make it clear that doing so would put them in significant jeopardy. *Guzman*, 495 F.3d at 858 (citing *Peate*, 294 F.3d at 883)); *see also Williams v. Willits*, 853 F.2d 586, 591 (8th Cir. 1988) (recognizing that guards who attempted to intervene in a fight involving inmates but then stopped due to being outnumbered "made the perfectly reasonable decision that further intervention would threaten the health and safety of all concerned" because "the guards were suddenly outnumbered by inmates which . . . made breaking up the fight physically impossible.").

Poindexter gives an alternative retelling of events in which the Officers delayed responding to intentionally teach him "a lesson." Dkt. 97 at 23–24. But as the Defendants correctly argue, this conflicts with all evidence on the record

and even Poindexter's own deposition testimony. Further, he has not addressed any of the Defendants' substantive arguments in his response why any of the Defendants should be liable. Accordingly, no reasonable juror would find that Officers Gray and Richardson were deliberately indifferent to Poindexter's safety during the second attack. Summary judgment must be granted in their favor.[4]

## IV. CONCLUSION

The IDOC Defendants' motion for summary judgment, dkt. [86], is **GRANTED**. Final judgment will issue in a separate entry.

**SO ORDERED.**

Date: 9/30/2026

Justin R. Olson
United States District Judge
Southern District of Indiana

Distribution:

JWAUN L. POINDEXTER
149218
WABASH VALLEY - CF
Wabash Valley Correctional Facility
Electronic Service Participant – Court Only

All Electronically Registered Counsel

[4] Because the Court finds that Poindexter's Eighth Amendment rights were not violated by any defendant, the Court need not explore the qualified immunity issue.